JUDGE DANIELS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK 07 CV 2096

---------------------------------------------------------------- x

IRVING BRAUN, Individually and On Behalf :    Civil Action No.
of All Others Similarly Situated,    :
   :
           Plaintiff,    :    CLASS ACTION COMPLAINT FOR
   :    VIOLATIONS OF FEDERAL SECURITIES
   :    LAWS
     vs.    :
   :
ALVARION LTD., ZVI SLONIMSKY, TZVI : 
FRIEDMAN AND DAFNA GRUBER,    :
   :
           Defendants.    :
   :

---------------------------------------------------------------- x

RECEIVED
MAR 12 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Alvarion, Ltd. ("Alvarion" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the publicly traded securities of Alvarion between November 3, 2004 through May 12, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).   Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff Irving Braun, as set forth in the accompanying certification and incorporated by reference herein, purchased the publicly traded securities of Alvarion at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant Alvarion is incorporated in Israel and engages in the design, development, manufacture, and marketing of wireless products worldwide.

8.     (a)     Defendant Zvi Slonimsky ("Slonimsky") was Alvarion's Chief Executive Officer ("CEO") until October 2005.

       (b)     Defendant Tzvi Friedman ("Friedman") is Alvarion's CEO, President and Chief Operating Officer.

       (c)     Defendant Dafna Gruber ("Gruber") is, and was at all relevant times, Alvarion's Chief Financial Officer ("CFO").

       (d)     Defendants Slonimsky, Friedman and Gruber are referred to herein as the "Individual Defendants."

9.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Alvarion, were privy to confidential and proprietary information concerning Alvarion, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Alvarion, as discussed in detail below. Because of their positions with Alvarion, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants

- 2 -

knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Alvarion's business.

11.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

12.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ National Market ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Alvarion's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Alvarion's securities would be based upon truthful

- 3 -

and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Alvarion's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Alvarion's business, operations and management and the intrinsic value of Alvarion's securities; (ii) enabled Defendant Slonimsky and other Company insiders to sell 1.37 million shares of their personally-held Alvarion stock for gross proceeds in excess of $17.2 million; and (iii) caused plaintiff and members of the Class to purchase Alvarion's publicly traded securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the publicly-traded securities of Alvarion between November 3, 2004 through May 12, 2006, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

15.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Alvarion's stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified

from records maintained by Alvarion or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Alvarion;

        (c)     whether the prices of Alvarion's publicly traded securities were artificially inflated during the Class Period; and

        (d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

- 5 -

## SUBSTANTIVE ALLEGATIONS

20.     Defendant Alvarion describes itself as the "world's leading provider of innovative wireless broadband network solutions enabling Personal Broadband to improve lifestyles and productivity with portable and mobile data, VoIP, video and other services."

21.     Throughout the Class Period, the Company represented that its success was dependent upon a "large operator in Latin America" which accounted for about 30% of their annual revenue in 2004.  Although defendants did not identify this "large operator" by name, the market understood that it was Telmex, which is Mexico's leading telecommunications company. Unbeknownst to investors, however, Alvarion's sales to Telmex were rapidly decreasing.  After receiving a large order from Telmex in 2003, which was filled in 2003 and deployed in 2004 and 2005, the Company did not receive an additional order from Telmex until the end of 2005.

22.     On July 5, 2005, the Company announced its preliminary financial results for the second quarter of 2005, the period ended June 30, 2005.  The Company revised its revenue and earnings per share estimates due to "the probability that its largest customer in 2004 would account for a very low amount of Q2 revenue compared to its revenue contribution in the past several quarters."

23.     Upon this news, shares of Alvarion common stock fell $2.58 per share, or approximately 23%, to close at $8.88 per share, on extremely heavy trading volume.

24.     On August 3, 2005, the Company announced its financial results for the second quarter of 2005, the period ended June 30, 2005, and released its guidance for the third quarter of 2005.  The Company further announced that it will exclude "any substantial revenue" from its "largest client" in its guidance for the second half of 2005.

25.     Upon this news, shares of Alvarion common stock fell $1.35 per share, or approximately 14%, to close at $8.88 per share, on heavy trading volume.

26.    Then, on May 12, 2006, the Company filed its annual report on Form 20-F which revealed that revenues for 2005 were impacted by decreased sales to Telmex and that Telmex would not be a major customer in 2006.

27.    Upon this announcement, shares of Alvarion fell from $8.20, on May 10, 2006, to $7.92 per share, on May 12, 2006.

28.    Prior to these disclosures, Defendant Slonimsky and other Company insiders sold 1.37 million shares of their personally-held Alvarion stock for gross proceeds in excess of $17.2 million.

### Materially False and Misleading Statements Made During the Class Period

29.    The Class Period begins on November 3, 2004.  On that date, the Company issued a press release announcing its financial results for the third quarter of 2004, the period ended September 30, 2004.  For the quarter, Alvarion reported revenues of $52.2 million and net income of $3.7 million, or $0.06 per share on a fully diluted basis. Defendant Slonimsky, commenting on the results, stated, in pertinent part, as follows:

> Both technological and market leadership combined with strong execution led to another outstanding quarter for the company.  Once again we achieved improvement in all financial measurements.
>
> We are continuing to enhance our position as the leader in both broadband wireless access and the adoption of the WiMAX standard. Our broad-based growth in Q3 again reflected the increase in worldwide demand for wireless broadband solutions. We also continue to see a high degree of interest in the WiMAX standard. We were extremely gratified by the outstanding customer response to the BreezeMAX 3500, our new WiMAX-ready system. Exemplifying the strong response were two new BreezeMAX customers announced recently – Altitude Telecom, an independent operator in France planning a nationwide WiMAX network, and MobileCity, which is deploying the first WiMAX-ready network in Scandinavia. During Q3, we received the first sample chips from Intel for the standard CPE. We are pleased with the progress that Intel is making and we are on track for having an Intel-based CPE in the market by mid-year 2005.
>
> ***During the third quarter, we continued to see strong demand for all product groups from operators around the world***. We were pleased by the follow-on orders from

- 7 -

existing Tier 1 incumbent carriers in Latin America, Europe, South Africa, and China. We expect these regions to continue to be sources of strong growth going forward. On October 16, 2004, we amended the amalgamation agreement with interWAVE Communications International Ltd., a leading supplier of compact cellular network infrastructure based on GSM and CDMA2000 technology that is particularly well-suited for rural areas in developing regions. We are currently awaiting approval of the deal by interWAVE shareholders and, once completed, this acquisition will complement our existing wireless solutions with a cost effective fixed and mobile solution to serve the need for voice and data in regions of the world that need telecommunication infrastructure. We intend to apply our experience in integrating acquisitions to realize the benefits of the combined company.

With regard to its fourth quarter guidance, the press release continued, in pertinent part, as follows:

Q4 2004 Guidance

The Company expects Q4 2004 revenues to range between $54 million and $56 million. At this revenue range, net earnings per share are expected to range between 7 and 8 cents while non-GAAP net earnings per share, which excludes amortization of intangible assets and deferred stock-based compensation, is expected to range between 8 and 9 cents. The fourth quarter guidance also excludes any impact on results of operations and any one time transaction-related charges associated with the acquisition of interWAVE Communications International Ltd., which the company hopes to close by the end of Q4.

30.    On November 3, 2004, the Company held a conference call with analysts. With regard to the Company's relationship with Telmex, Defendants Slonimsky and Gruber stated, in pertinent part, as follows:

UNIDENTIFIED SPEAKER: Great quarter, congratulations. I was hoping you could give us a little flavor on how your initial deployments would be tier going? And then not to beat around the bush, Telmex has been a great customer for you and clearly the follow-on orders indicate you are executing well there. I think a big concern on the stock is what happens as you complete the work on Telmex in the second or third quarter of next year. So what I was hoping to get some flavor on is A) are you confident in more business from Telmex? Or B) you've announced a number of great wins over the last couple of quarters. Do you think between China and BT and the France contract and some of the other geographies that are doing well for you that you could potentially offset the end of the Telmex contract? Or excuse me, the Latin American contract?

ZVI SLONIMSKY: First regarding the BT, they already started deploying gradually our productline. They are very much committed to the growth in wireless access space, and we are also in intensive discussion with them with (indiscernible) wireless going forward. ***Regarding Telmex, first of all we've got an infrastructure order,***

*which also indicates there is going to be continued deployment of this product line going forward.* We expect our growth to come first from Telmex, west and eastern Europe, APAC and other customers all over the world and Latin America.

\* \* \* \*

STEPHEN KOFFLER: Okay, and then you add on what you have. So my question -- let me just finish with this question. *Can you tell us more about the visibility you have from Telmex or large Latin America customer or from some other source?* At least for now, it seems like it's going to slow down for some period, yet you are guiding for sequential growth and you're not talking about seasonality in Q1. So what's the source of the visibility, if you could give us a little bit more detail on that?

ZVI SLONIMSKY: First of all, our visibility comes from – it's not great but it is reasonable visibility because we have a lot of customers all over the world in different territories. So we are less -- we get less affected by different macroeconomics and different (indiscernible) there is a blanket of macroeconomic issue. We see a lot of interest in the WiMAX space and the very well introduction of our BreezeMAX platform, and on top of it, this large Latin America customer continued to put all the results, the last order of infrastructure is giving us visibility of a large amount of future sales in his region. So we don't expect pick-ups going forward.

STEPHEN KOFFLER: Let me ask it one different way. Is it possible that the large Latin America customer goes down to below a 20 percent customer, but then maybe comes back to a 30 percent customer sometime later, maybe by second quarter? Is that something that you're thinking about possibly happening?

DAFNA GRUBER: I think it is difficult to estimate the pattern of the order. *I think year-over-year, we believe we can continue to grow our business based on additional orders from this customer and also from other opportunities we see in front of us*.

[Emphasis added.]

31.     On February 16, 2005, the Company issued a press release announcing its financial results for the fourth quarter and year end of 2004, the period ended December 31, 2004.  For the quarter, Alvarion reported revenues of $55.9 million and a net loss of $6.8 million, or $(0.12) per share. Defendant Slonimsky, commenting on the results, stated, in pertinent part, as follows:

We are pleased to report a strong finish to an excellent year. We grew every quarter during 2004 and ended the year with $200 million in revenue from our traditional business, a 57% increase from the prior year. During 2004, the company generated

an impressive $20 million in cash flow from operations and, after acquisition-related payments, we ended the year with about $133 million in cash on our balance sheet.

\* \* \* \*

In addition to strong growth, we achieved a number of important business objectives and began multiple strategic initiatives to enhance our future prospects for growth and industry leadership.

During the year, we dramatically increased our direct sales and proved that we can handle large projects for major operators, while also strengthening our relationships with OEM partners and distributors around the globe. Recently, we expanded our existing OEM relationships with Siemens and Alcatel to include our BreezeMAX product and signed a new WiMAX OEM agreement with Lucent as well.

In June, we introduced BreezeMAX 3500, which made us the first vendor to market a WiMAX-ready product. We are gratified by the strong interest in WiMAX from every type of customer, both incumbent and alternative carriers as well as both fixed and mobile operators. We have about 50 installations of our WiMAX-ready solution – either as commercial deployments or in various stages of trial activity. Operators that already have commercial deployments of our WiMAX-ready solutions include, among others, Iberbanda in Spain, Altitude in France and MobileCity in Scandinavia. This points to Alvarion as the vendor of choice for future WiMAX solutions, and we believe that this high level of interest will be converted into revenue mostly beginning in the second half of 2005.

We are executing well on our product plans and continue to expect to be introducing an Intel-based WiMAX CPE by mid-year. We plan to expand into the mobile broadband arena next year via two strategic moves. First was the acquisition of the interWAVE cellular mobile business in December. We've added products that support compact GSM and CDMA cellular network deployments and network extensions in hard to reach areas such as rural portion of developing regions, as well as compact cellular networks for specialty applications such as homeland security, disaster relief and travel and leisure. The new CDMA technology complements our existing voice and data capabilities in developing regions. We are pleased that the integration process is moving smoothly and according to our plans.

The second strategic move was the formation of a new business unit to focus on developing a mobile WiMAX solution to be launched next year. The new mobile WiMAX business unit will draw on the technology and experience from both the fixed BWA and cellular businesses to accelerate development.

Owing to our strong financial condition and experienced and dedicated team, we were able to deliver outstanding performance while making a number of strategic investments to enhance our position in the future. This is an accomplishment the entire Alvarion Team should take pride in.

- 10 -

With regard to its first quarter 2005 guidance, the press release continued, in pertinent part, as follows:

> Q1 2005 Guidance
>
> The Company expects Q1 2005 revenue to range between $57 and $60 million. At this revenue range, net earnings per share are expected to range between breakeven and $0.01, while non-GAAP net earnings per share, which excludes special charges, amortization of intangible assets and deferred stock-based compensation, are expected to range between $0.03 and $0.04.

32.     On February 16, 2005, the Company held a conference call with analysts. With regard to the Company's relationship with Telmex, Defendant Slonimsky stated, in pertinent part, as follows:

> TROY PEERY: Congratulations. I was wondering if you could characterize the revenue visibility at your largest customer that you have in terms of the timing of any orders that you might see and the size of those orders?
>
> ZVI SLONIMSKY: The visibility, especially since we're at the beginning of the year is relatively low. Most of our orders are not very large ones. We don't have too many [inaudible] customers up front. ***However, going forward, we expect that some initiatives that we are starting here will see a major incumbent joining in. We expect [TELMEX] to be over 10% customer through the year.***
>
> [Emphasis added.]

33.     On May 4, 2005, the Company issued a press release announcing its financial results for the first quarter of 2005, the period ended March 31, 2005.  For the quarter, Alvarion reported revenue of $57.2 million and net income of $0.4 million, or $0.01 per share.  Defendant Slonimsky, commenting on the results, stated, in pertinent part, as follows:

> Our team executed very well this quarter on all major objectives - financial, technical, and market development.  We are meeting our targets and continue to expect revenue growth of at least 25% this year.
>
> Demand is strong for both WiMAX and non-WiMAX solutions, and growth in Q1 was broad-based, coming from products for both licensed and license-exempt frequencies. Europe was a particular source of strength again this quarter as a result of increasing demand from independent operators using the 5.4 GHz licensed-exempt band that recently became available throughout Europe. These operators are moving

- 11 -

aggressively to fill the holes in DSL coverage and, in turn, are prompting the Tier 1 operators to begin moving as well.

The integration of interWAVE's business is progressing according to plan, and we are beginning to expand our pipeline of new opportunities. Based on this we continue to believe that, once we move through the normal sales cycles for this business, we will begin to see more traction during the second half of the year.

We recently celebrated another important milestone in the widespread adoption of the WiMAX standard when Intel officially launched their Intel PRO/Wireless 5116 chip. Alvarion is the first company to offer a live demonstration of a working CPE, based on the Intel chip, connected to a live operator's network. This important event took place during the last WiMAX summit in Malaga and is an indication of our time-to-market advantage.

It was certainly gratifying that most of the operators that participated in the Intel launch event, including Altitude, Iberbanda, and Millicom, are Alvarion customers. Evaluation and trial deployment activity remains brisk, with Alvarion involved in most of the active trials around the world. The scope and duration of these trials up to this point reinforces our belief that our growth will accelerate in the second half of the year.

We believe that we stand on the threshold of the WiMAX revolution in fixed broadband access, and we look forward to continuing to lead the market for mobile WiMAX through our collaboration with several major partners. We see a bright future for both fixed and mobile applications of this technology.

With regard to its guidance for the second quarter of 2005, the press release continued, in pertinent part, as follows:

Guidance

The Company's revenue guidance for Q2 2005 is $53 million to $58 million. This guidance assumes no substantial contribution from additional orders related to a major customer's ongoing project due to the difficulty in predicting the precise timing of orders.

At the revenue range above, net earnings per share are expected to range between breakeven and 3 cents while non-GAAP net earnings per share, which excludes amortization of intangibles and acquisition-related charges, is expected to range between 2 and 5 cents.

34.     On June 21, 2005, the Company announced that Tzvika Friedman, president and chief operating officer of Alvarion for the past four years, would succeed Defendant Slonimsky as CEO in October 2005.

35.     The statements referenced above in ¶¶ 29-33 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts:

(a)     that the Company's sales to its largest customer – Telmex – were decreasing rapidly;

(b)     that the Company would not be able to grow its business based on orders it was receiving from Telmex; and

(c)     that, as a result of the foregoing, the Company's financial projections for 2005 and beyond were lacking in a reasonable basis at all relevant times.

**The Truth Begins to Emerge**

36.     On July 5, 2005, the Company issued a press release announcing its preliminary financial results for the second quarter of 2005, the period ended June 30, 2005.  For the quarter, Alvarion expected revenues of between $46 and $47 million and earnings per share of $(0.06) to $(0.08).  The press release continued, in pertinent part, as follows:

> The shortfall was caused by unrelated customer-specific issues in non-WiMAX areas:
>
> Delays in a few projects as a result of customers' internal reasons such as budget adjustments
>
> Slower-than-expected installations, mainly of certain compact cellular projects, which did not allow us to recognize the revenue from equipment already shipped.
>
> Management's original Q2 guidance already took into account both some minor disruption from the transition to WiMAX and the probability that its largest customer in 2004 would account for a very low amount of Q2 revenue compared to its revenue contribution in the past several quarters.
>
> "It became clear that these customer-specific delays would affect our Q2 revenue in the final days of the quarter," said Zvi Slonimsky, CEO of Alvarion. "Interest in WiMAX continues to gain momentum and, although it was a relatively small portion of the total, revenue from our BreezeMAX™ product was in line with our plan in Q2."

"We continue to expect the second half of 2005 to be better than the first half. In light of the Q2 shortfall, we will have to re-evaluate the achievability of our target for the year, and we will give guidance for Q3 and update the overall outlook on August 3, after we have had an opportunity to go through our normal quarterly analysis process," concluded Mr. Slonimsky.

37.     On July 5, 2005, the Company held a conference call with analysts. With regard to

the Company's relationship with Telmex, Defendant Slonimsky stated, in pertinent part, as follows:

ZVI SLONIMSKY, CEO, ALVARION, LTD.: Thank you. Good morning everyone. We are here to talk about our revised view of Q2 and explain why we expect it to come in lower than our previous guidance. The best indication we can give you is that Q2 revenue will be between 46 million and 47 million. Our original guidance took into account the probability of the small amount of revenue from our largest customer, (indiscernible), to Q2 '04, (indiscernible) towards about 30% of the total. Excluding this customer, our organic (indiscernible) versus Q2 '04 will be over 30%.

However, our revised range represents a sequential decline from Q1, even after excluding the impact of our largest customer. This is something we did not expect. Our preliminary analysis indicates that the shortfall was caused by a number of unrelated customer-specific situations. There was no pattern in terms of geography or any other common denominator that we can see. We did our best to characterize the factors (ph) in the press release -- budget revision, regulatory issues -- a whole variety of customers' internal issues that has nothing to do with us directly. Our confidentiality obligation to customers prevents me from giving you the details of each situation, but I will give you one example that will help you understand what we are talking about.

As you know, Telekom Serbia has been a customer for quite some time, and they are replacing damaged or missing infrastructure with our BWA equipment. Recently, the Serbian government instituted about 20% value added taxes, which in turn caused Telekom Serbia to put their entire equipment budget on hold. They still have a need for our product, but it is unclear how and when this will be sorted out. This is just one example. And the others that I can talk about it are (indiscernible) relevant to the specific customer (indiscernible) representative of some major trends or issues.

In the final days of the quarter, we also determined that lower-than-expected installation, mainly in the cellular mobile business, would delay acceptance and prevent us from recognizing revenue on some equipment already shipped. Despite the outstanding efforts of our sales and implementation teams, we were unable to compensate for these developments in time to meet our guidance.

Anticipating some of your questions, I want to emphasize the following -- our BreezeMAX business is in line with our expectations and we see no issues here. BreezeMAX is still a relatively small part of the total business, and we expect it to increase in the second half of the year. We are stressing (ph) our time to market

advantage whenever possible and we are pleased with the progress we are making with various carrier relations.

We are not aware of any situation where we lost any substantial order we were expecting to another vendor. We are satisfied with the level of shipments (ph) and new opportunities we see in the compact cellular business. We hope to have a better handle on timing of revenue recognition under our policies as we gain more deployment experience. In this case, the installation delay was not particularly severe, it just happened to come at the end of the quarter.

***We are tempted to label this one quarter phenomenon and just keep going; yet, being cautious, we need time to carefully review everything in the course of our normal quarterly analysis process before we give specific guidance for the rest of the year.*** We will give you specific guidance on (indiscernible) sales (indiscernible) when we report final Q2 results.

Meanwhile, I will attempt to address our current view on the major issue that we know you are thinking about -- WiMAX. We are very proud of our early success with BreezeMAX. We have more equipment in the field than any other vendor. We are on track for commercial release of both the outdoor and indoor Intel-based CPE -- the outdoor in Q3 and the indoor before the end of the year.

WiMAX is clearly happening, but there still could be bumps in the road. Not surprisingly, some equipment vendors that are struggling to have a product ready to sell are trying to find ways to persuade carriers to delay their orders to give them a chance to be ready. Several territories (indiscernible) supposed to be allocated by now or in the near future are experiencing delays. We are monitoring this issue closely.

***Largest customer. During Q2 we shipped a small amount of equipment to our largest customer. Some reports have talked about this Latin American operator going away. Not true. We are talking with them about a number of projects and we feel comfortable that we understand their needs. They are happy with us and we continue to expect additional orders, although the timing remains difficult to anticipate.***

Cellular mobile units. We continue to invest in the cellular mobile (indiscernible) because we see good opportunities to grow this business and we are satisfied with the level of shipments. We do need (ph) to take a closer look at the timing of revenue recognition before we update our guidance.

\* \* \* \*

TROY PEERY: Separately, do you consider the Company on track to reach 10% topline contribution from the large Latin American customer this year?

- 15 -

> ZVI SLONIMSKY: We expect them to be an important customer in the future and
> we will update the components of our guidance on the next call.

[Emphasis added.]

38.    Upon this news, shares of Alvarion common stock fell $2.58 per share, or

approximately 23%, to close at $8.88 per share, on extremely heavy trading volume.

39.    On August 3, 2005, the Company issued a press release announcing its financial

results for the second quarter of 2005, the period ended June 30, 2005.  For the quarter, Alvarion

reported revenues of $47.0 million and a net loss of $3.6 million, or ($0.06) per share.  Defendant

Slonimsky, commenting on the results, stated, in pertinent part, as follows:

> Despite a challenging quarter, BreezeMAX revenue continued to grow in line with
> our original expectations and we achieved several important goals.  We continued to
> expand the number of WiMAX trials and evaluations and believe we are engaged in
> more WiMAX activity than any other vendor. In addition to expanded trials, in Q2
> we began to see additional orders for commercial deployments of the BreezeMAX
> platform in several regions of the world. This is significant beyond the immediate
> contribution to revenue because these deployments will afford us valuable field
> experience that will help us maintain our market lead.
>
> We are on track with a number of new product introductions. In April, Alvarion was
> the first vendor to demonstrate a working outdoor CPE based on the Intel chip. Later
> in the quarter, we also demonstrated our indoor self-install CPE, also based on the
> Intel chip, at several industry events. We also announced the expansion of the
> BreezeMAX platform to include 2.3 GHz and 2.5 GHz bands for North America. In
> addition, we introduced enhancements to some of our non-WiMAX products
> including the MPOTS extension of our multi-service solution, significantly
> improving the price per line for carriers.
>
> The integration of the interWAVE business is progressing according to plan, and we
> are continuing to expand our pipeline of new opportunities. As these opportunities
> move through the normal sales cycle, we expect to see better traction and higher
> revenues during the second half of the year for this business.
>
> We have always expected a relatively slow first half of 2005, due to the transition of
> our wireless DSL products to a WiMAX standard-based platform. Our original
> guidance, particularly for Q2, assumed some displacement of proprietary products
> and longer sales cycles as customers considered moving to BreezeMAX. After a
> detailed analysis of actual Q2 results, we confirmed that the reasons for the revenue
> delays in our non-WiMAX products were indeed customer-specific, but we also

- 16 -

identified an underlying hesitation on the part of customers for our TDM voice-oriented products. This was something we had not anticipated.

Looking ahead to the second half of the year, [w]e continue to expect growth from our wireless DSL solutions, both our current advanced products for the unlicensed bands and WiMAX-ready products in the licensed bands. However, our revised outlook assumes that this growth will be less robust than we originally expected due to longer-than-expected sales cycles and potential further delays in allocating licensed spectrum in certain key regions. Our second half expectations are also tempered by the likely continuation of weakness in TDM voice-oriented solutions as customers evaluate potential WiMAX alternatives. We continue to expect improving business momentum in our cellular mobile business in the second half of the year but, as was the case in Q2, we may not recognize revenue in the same quarter as we ship the equipment. Finally, for some of the same reasons just cited, we have excluded from our guidance any substantial revenue from a major customer that accounted for a significant amount of our revenue in 2004. We continue to believe that there is a good possibility of further orders from this customer in the second half and, therefore, we believe there is some potential upside to our revised outlook.

With regard to its guidance for the third quarter of 2005, the press release continued, in pertinent part, as follows:

Third Quarter Guidance

The Company's revenue guidance for Q3 2005 is $43 million to $48 million. At this revenue range, per share results are expected to range between a loss of 6 and 10 cents per share, while the non-GAAP loss per share, which excludes amortization of intangibles and deferred stock compensation, is expected to range between 4 and 8 cents.

40.     Upon this news, shares of Alvarion common stock fell $1.35 per share, or approximately 14%, to close at $8.88 per share, on extremely heavy trading volume.

41.     On November 9, 2005, the Company issued a press release announcing its financial results for the third quarter of 2005, the period ended September 30, 2005. For the quarter, Alvarion reported revenues of $45.0 million and a net loss of $5.5 million, or ($0.09) per share. Defendant Friedman, commenting on the results, stated, in pertinent part, as follows:

Q3 included several important achievements including the excellent demand for our new subscriber unit using Intel's WiMAX chip during its first month of availability and the recent large orders secured for our cellular mobile solution. We view these as positive signs for the future.

- 17 -

We continue to invest aggressively for our long-term future. Our increase in operating expenses versus a year ago reflects our focus on the successful integration of the compact cellular operations plus a very strong commitment to future versions of the 802.16 standard and the development of portable and mobile WiMAX solutions.

From a strategic perspective, our progress is demonstrated by more than 30 commercial deployments of our solution based on the 802.16 WiMAX standard. BreezeMAX revenue grew again in Q3 to reach 20% of total revenue. Our advanced, feature-rich solution, combined with our depth of experience and clear roadmap, is responsible for our leading the industry in commercial deployments and WiMAX-related revenue. The next milestone will be the first shipments of our advanced indoor self-install version of the Intel-based CPE with switching antennas and subchannelization support. We believe that the availability of self-install products will be a catalyst for growth of the industry and of our growth next year.

There are several elements of our strategy to grow revenue and improve profitability. We plan to maintain and reinforce our position as the market leader in fixed wireless broadband by continuing to introduce standards-based, feature-rich solutions that improve the business case of the operators. We also intend to leverage our technology, know-how, brand name recognition, and our position as the largest player in broadband wireless access business, plus our field-experience and strategic relationships, to become an early leader in the promising area of mobile WiMAX. Mobile broadband will be a very large market and we believe that it will be served by multiple technologies, including WiMAX. We see attractive opportunities in both fixed and mobile WiMAX, and everything in-between such as portable solutions, for years to come.

To accelerate our growth in the compact cellular market, we will continue utilizing our operating skills to expand channels, improve processes, and continue product innovation. Projects like the ones with Outremer and Cable & Wireless clearly demonstrate that we are gaining traction and we are optimistic about winning additional projects.

Next year we will transition to a more decentralized structure with fewer layers of management as part of organizing the company to focus all types of fixed broadband wireless access, portable and mobile WIMAX, and compact cellular solutions. We will have three operating units: Broadband Wireless Access, Cellular Mobile and Broadband Mobile, each with its own R&D, business development and marketing functions and with a senior executive in charge of the unit. In addition, we will have a single sales and support unit that will be responsible for all customers across all product lines, as well as a unified corporate operations group to improve efficiency and promote best practices across the entire organization. We are creating a structure that puts strong managers in charge of each of our key initiatives, enables us to maintain the flexibility to adjust to changing market dynamics, and supports our future growth.

With regard to its guidance for the fourth quarter of 2005, the press release continued, in pertinent part, as follows:

> Q4 Guidance
>
> The Company's revenue guidance for Q4 2005 is $45 million to $50 million.  At this revenue range, per share results are expected to range between a loss of 5 and 9 cents per share, while the non-GAAP loss per share, which excludes amortization of intangibles and deferred stock compensation, is expected to range between 3 and 7 cents.

42.     On February 8, 2006, the Company issued a press release announcing its financial results for the fourth quarter and year end of 2005, the period ended December 31, 2005.  For the quarter, Alvarion reported revenues of $46.5 million and a net loss of $4.9 million, or ($0.08) per share.  Defendant Friedman, commenting on the results, stated, in pertinent part, as follows:

> We are pleased that we resumed sequential growth in Q4.  Broadband wireless access revenue increased for both WiMAX and non-WiMAX based solutions in Q4.
>
> We were particularly gratified by the continued strong performance of our BreezeMAX product, which increased to about $10 million in revenue in Q4. Our fundamental business, primarily wireless DSL solutions, is performing well during the transition to WiMAX and should continue to be the main engine for growth in 2006. We have strengthened our position with some of the carriers we refer to as "innovative challengers" because they are early adopters of new technology, and we expect the overall upward trend to continue.
>
> Other significant developments in Q4 included the successful launch of the largest ever project for our cellular mobile unit, complete networks for the islands of Guadeloupe and Martinique by Outremer Telecom. We believe this will be an important reference account that will help us land more large orders for the cellular mobile unit In addition, a major Latin American customer has placed an initial $7 million order under a new frame agreement that could be worth up to $15 million., covering both BreezeMAX™ and eMGW™ products for several countries in Latin America.
>
> The fixed broadband wireless access market – both WiMAX and non-WiMAX – will be an important and growing market for the next several years.  We continue to dominate the BWA market where we retain a 30% market share.  Our leading position is evidence of our customers' satisfaction with our superior product offering and support.

- 19 -

We continue to invest in building our company to be a major player in the growing WiMAX market for fixed, nomadic and mobile applications.  We are focusing our investment on aggressively expanding our family of WiMAX solutions to include additional frequencies, additional marketing activities with Tier 1 carriers, mobile WiMAX development, affording our customers a smooth migration path to the recently ratified 802.16e standard, and development to enable an array of new services.

While we continue our focus on retaining our leadership in this market, we will also pursue our commitment to realizing the vision of personal broadband to enhance lifestyles and improve productivity with our mobile WiMAX solutions.  Moving true broadband from an entirely facilities-based offering to one that is an 'anytime, anywhere' personal offering will create a host of new opportunities in the telecom ecosystem.  We are positioning Alvarion to be the partner of choice for operators, both new and incumbent, technology partners, and systems integrators as the market evolves.

With regard to its guidance for the first quarter of 2006, the press release continued, in pertinent part, as follows:

Q1 Guidance

The Company's revenue guidance for Q1 2006 is $46 million to $51 million.  At this revenue range, non GAAP per share results are expected to range between a loss of 3 and 6 cents per share. This guidance excludes expenses related to amortization of acquired intangibles and estimated recurring quarterly stock option expenses resulting from the adoption of SFAS 123R. Also excluded from non-GAAP guidance is a one-time positive cumulative effect of  a change in accounting principle under SFAS 123R which cannot be quantified at this time. Since it is too early to indicate the impact of this one-time positive cumulative effect, the company will not provide GAAP earnings per share guidance.

43.    The statements referenced above in ¶¶ 36-37, 39, 41-42 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts:

(a)    that the Company's sales to Telmex were decreasing rapidly;

(b)    that the Company would not be able to grow its business based on orders it was receiving from Telmex; and

(c)    that, as a result of the foregoing, the Company's financial projections were lacking in a reasonable basis at all relevant times.

**The Truth Emerges**

44.     On May 10, 2006, the Company issued a press release announcing its financial results for the first quarter of 2006, the period ended March 31, 2006.  For the quarter, Alvarion reported revenues of $48.1 million and a net loss of $5.0 million, or ($0.08) per share.  Defendant Friedman, commenting on the results, stated, in pertinent part, as follows:

> We are pleased with the continued sequential growth in Q1, particularly during a period that traditionally has been a seasonally weak quarter.  This quarter we improved gross margin and significantly reduced our non-GAAP loss.

> We continue to lead the adoption of WiMAX.  Since we introduced our BreezeMAX solution, it has generated over $50 million in revenue, many times the sales of other vendors' WiMAX products. In Q1, BreezeMAX again grew to reach 28% of our total revenue, compared with about 10% in the same period last year.  With 55 commercial deployments and about 100 active trials, we are still at the very beginning of the adoption curve.  We believe deployments will be expanded and trials will translate into additional business once some of the operators complete their technology qualification cycle or obtain licenses for spectrum, and once WiMAX solutions are available in additional frequencies, and self-install subscriber units become widely available. We are expecting progress in each of these areas in the second half of this year.

> Revenue from our other broadband wireless solutions remained steady and we are continuing to expand our customer base in frequencies where there is no WiMAX profile and in the unlicensed bands.  We recently signed a worldwide strategic partnership agreement with IBM and have won several deals with them in the municipal broadband market in the U.S.

> As a result of a disappointing level of orders in our cellular mobile unit ("CMU") so far in Q2 and our assessment of the outlook, we have decided to refocus the business to concentrate on generating positive cash flow, mainly from our GSM solutions, while supporting all current customers. We are beginning an analysis to determine the possible need for a certain non-cash charge in Q2 for impairment of some of the intangible assets related to this business.

> In Q1 we reached an important milestone for the whole industry with the first live showcase of our mobile WiMAX solution called 4Motion(TM) at the CTIA show in Las Vegas.  4Motion is our complete WiMAX 802.16e-2005 solution portfolio that we are developing in conjunction with leading providers of core network and IP technology to make personal broadband anywhere a reality.  We are constantly shifting more of our resources toward 802.16e-2005 4Motion solutions which are gaining increased interest and attention from a wide variety of operators.

With regard to its guidance for the second quarter of 2006, the press release continued, in pertinent part, as follows:

> Q2 Guidance
>
> The Company's revenue guidance for Q2 2006 is $48 million to $52 million. At this revenue range, non-GAAP per share results are expected to range between a loss of 2 and 5 cents per share. This guidance excludes expenses related to amortization of acquired intangibles, the effect of stock option expensing, and any possible one-time charges for the CMU business, if any. Since it is too early to indicate the impact of these charges, and whether or not certain of these charges will occur, the company will not provide GAAP earnings per share guidance.

45.     On May 12, 2006, the Company filed its Form 20-F with the SEC which repeated its financial results for the year ending December 31, 2005. With regard to Telmex, the annual report stated, in pertinent part, as follows:

> In 2003, 2004 and 2005, 13.9%, 30.6% and 5.2% of our sales were to a Latin American operator respectively. For 2005, sales to our Latin American customer decreased significantly due to the nearing completion of a large deployment. Partially as a result, our revenue decreased in 2005. Our reliance on this large customer adversely affected our results of operations in 2005, and if we are unable to attain and/or retain other large customers our revenues may be adversely affected.
>
> * * * *
>
> If our DSOs continue to increase and our revenues continue to decrease, we may suffer from cash shortfall. In 2003, 2004 and 2005 our DSOs were 61, 51 and 73 respectively. The increase in DSOs during 2005 was caused in large part by the reduction in sales to our large Latin American customer. Excluding the Latin American large customer the DSOs in 2003, 2004 and 2005 were 71, 73 and 77 respectively. If our DSOs continue to increase and our revenues continue to decrease our cash reserves will decrease.
>
> * * * *
>
> Wireless broadband sales in 2005 were approximately $176.9 million, a decrease of approximately 11.5% compared with sales of approximately $199.9 million in 2004. In 2004 and 2005, 30.6% and 5.2% of our sales were to a Latin American operator, respectively. ***For 2005, sales to our Latin American customer decreased significantly due to the nearing completion of a large project. Partly as a result, our revenue decreased in 2005.*** Excluding the impact of the large customer, wireless broadband sales increased approximately 20% in 2005 compared with 2004, reflecting broad-based demand for wireless broadband solutions, including the

BreezeMAX product, our WiMAX based platform. Sales in Europe, Middle East and Africa reached 58% of our BWA sales in 2005 reflecting an increase of 30% over 2004 sales in this region, attributed mainly to the progress in the spectrum allocation process and the early adoption of our broadband wireless products by well-capitalized independent operators. Sales in Central and Latin America accounted for 19% of our BWA sales in 2005 a decrease of 58% (in dollar value) over 2004 in this region, related mainly to the decrease in deployment of a single large customer. ***During 2003 we received a large order from a Latin American customer. Initial deployment of this order began in 2003 and the majority was deployed during 2004, with the remainder in 2005. Toward the end of 2005 we received a small additional order from this customer, to be deployed in 2006.***

[Emphasis added.]

46.     Upon this announcement, shares of Alvarion fell from $8.20, on May 10, 2006, to $7.92 per share, on May 12, 2006.

47.     The markets for Alvarion's securities were open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Alvarion's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Alvarion's securities relying upon the integrity of the market price of Alvarion's securities and market information relating to Alvarion, and have been damaged thereby.

48.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Alvarion's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

49.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the

- 23 -

Class Period, defendants made or caused to be made a series of materially false or misleading statements about Alvarion's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Alvarion and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

50.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Alvarion, their control over, and/or receipt and/or modification of Alvarion's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Alvarion, participated in the fraudulent scheme alleged herein.

51.    Defendants were further motivated to engage in this course of conduct in order to allow Defendant Slonimsky and other Company insiders to sell 1.37 million shares of their personally-held Alvarion stock for gross proceeds in excess of $17.2 million.  The insider shares sold during the Class Period are set forth more fully in the following chart:

| Name | Date | Shares | Price | Proceeds |
| --- | --- | --- | --- | --- |

| | | | | |
|---|---|---|---|---|
| Glazer, Benjamin | 6/6/2005 | 28,128 | $9.41 | $264,694 |
| | | | | |
| Hanigal, Benny | 11/4/2004 | 366,927 | $14.22 | $5,217,702 |
| | 5/17/2005 | 80,000 | $9.46 | $756,800 |
| **Total:** | | **446,927** | | **$5,974,502** |
| | | | | |
| Harnik, Zvika | 11/23/2005 | 5,340 | $9.35 | $49,929 |
| | 11/28/2005 | 16,820 | $9.19 | $154,576 |
| | 1/10/2006 | 225,000 | $9.22 | $2,074,500 |
| | 3/7/2006 | 3,716 | $9.46 | $35,153 |
| **Total:** | | **250,876** | | **$2,314,158** |
| | | | | |
| Maher, Anthony | 1/3/2006 | 18,000 | $8.72 | $156,960 |
| | | | | |
| Rosenzweig, Amir | 11/12/2004 | 45,900 | $14.86 | $682,074 |
| | 8/15/2005 | 50,000 | $8.64 | $432,000 |
| | 12/5/2005 | 79,300 | $8.91 | $706,563 |
| **Total:** | | **175,200** | | **$1,820,637** |
| | | | | |
| Slonimsky, Zvi | 11/15/2004 | 150,000 | $15.39 | $2,308,500 |
| | | | | |
| Yacoby, Amnon | 11/12/2004 | 300,000 | $14.86 | $4,458,000 |
| | | | | |
| **Total:** | **1,369,131** | | | **$17,297,451** |

## LOSS CAUSATION/ECONOMIC LOSS

52.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Alvarion's securities and operated as a fraud or deceit on Class Period purchasers of Alvarion's securities by issuing aggressive statements and opinions concerning the Company's ability to control costs, increase subscribers and become profitable.  When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Alvarion's securities fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Alvarion's securities during the Class Period, plaintiff and the other Class members suffered economic loss, i.e., damages under the federal securities laws.

53.     By failing to disclose that the Company's sales to Telmex were significantly decreasing, defendants presented a misleading picture of Alvarion's business and prospects.  Thus,

instead of truthfully disclosing during the Class Period the true risks that Alvarion was exposed to, defendants caused Alvarion to conceal the truth.

54.     Defendants' false and misleading statements had the intended effect and caused Alvarion's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $15.39 per share on November 12, 2004.

55.     As a direct result of defendants' disclosures on July 5, 2005, August 3, 2005, May 10, 2006 and May 12, 2006, Alvarion's common stock price fell.  These drops removed the inflation from the price of Alvarion's securities, causing real economic loss to investors who had purchased the Company's securities during the Class Period.

56.     The approximate 50% decline in the price of Alvarion's common stock from its Class Period high was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Alvarion's common stock price declines negate any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, i.e., damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Alvarion's securities and the subsequent significant decline in the value of Alvarion's securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

57.     At all relevant times, the market for Alvarion's securities was an efficient market for the following reasons, among others:

(a)     Alvarion's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

- 26 -

(b)    as a regulated issuer, Alvarion filed periodic public reports with the SEC and the NASDAQ;

(c)    Alvarion regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Alvarion was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

58.    As a result of the foregoing, the markets for Alvarion's securities promptly digested current information regarding Alvarion from all publicly available sources and reflected such information in the prices of the securities.  Under these circumstances, all purchasers of Alvarion's securities during the Class Period suffered similar injury through their purchase of Alvarion's securities at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

59.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking

statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Alvarion who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Alvarion's business, operations, management and the intrinsic value of Alvarion's securities; (ii) enable Defendant Slonimsky and other Company insiders to sell 1.37 million shares of their personally-held Alvarion stock for gross proceeds in excess of $17.2 million; and (iii) cause plaintiff and other members of the Class to purchase Alvarion's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

62.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Alvarion's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

- 28 -

63.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Alvarion as specified herein.

64.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Alvarion's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Alvarion and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Alvarion's securities during the Class Period.

65.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's

dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

66.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Alvarion's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

67.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Alvarion's securities were artificially inflated during the Class Period.  In ignorance of the fact that market prices of Alvarion's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Alvarion's securities during the Class Period at artificially high prices and were damaged thereby.

68.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding Alvarion's financial results, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Alvarion's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

69.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

70.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

71.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72.    The Individual Defendants acted as controlling persons of Alvarion within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which

plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

73.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

74.     As set forth above, Alvarion and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: March 2, 2007                    LERACH COUGHLIN STOIA GELLER
                                        RUDMAN & ROBBINS LLP


                                        _____
                                        SAMUEL H. RUDMAN

                                        SAMUEL H. RUDMAN (SR-7957)
                                        DAVID A. ROSENFELD (DR-7564)
                                        MARIO ALBA JR. (MA-7240)
                                        58 South Service Road, Suite 200
                                        Melville, NY 11747
                                        Telephone: 631.367.7100

                                        LAW OFFICES OF CURTIS V. TRINKO
                                        CURTIS V. TRINKO
                                        16 West 46th Street
                                        New York, New York 10036
                                        Telephone: 212/490-9550
                                        212/986-0158

                                        Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

IRVING S. BRAUN ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 03/28/05 | 2,000 shares | $10.01 |
| 08/03/05 | 1,000 shares | $ 8.25 |
| | | |

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Sekuk Global Enterprises v. KVH Industries, Inc., et al.*, No. CA-04-306L (D. R.I.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

ALVARION

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2⁄ day of _____, 2007.

_____
IRVING S. BRAUN

- 2 -

ALVARION